UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION

| | |
|---|---|
| HANNA EVERETT and MICHAEL EVERETT, | CASE NUMBER:_____ |
| Plaintiffs, | JUDGE:_____ |
| v. | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| BYHEART, INC., a Delaware corporation, | |
| Defendant. | |

## **COMPLAINT**

Plaintiffs Hanna and Michael Everett, individually and as the parents and natural guardians of P.E., by and through their undersigned counsel, Rittgers, Rittgers, & Nakajima, and OFT Law PLLC, submit this Complaint and Demand for Jury Trial against ByHeart, Inc. ("ByHeart"), and allege the following upon personal knowledge and belief, and investigation of counsel:

## **NATURE OF THE ACTION**

1.      This case arises from a parent's worst nightmare: infant formula laced with dangerous bacteria. Plaintiffs purchased Defendant ByHeart, Inc.'s infant formula because it promised to be a cutting-edge, "clinically proven," healthier alternative to traditional formula. The Everetts painstakingly prepared the formula and fed it to their beloved four-month old daughter P.E. Soon after consuming the formula, she developed constipation and alarming neurological symptoms. Plaintiffs brought their first-born daughter to the emergency department where doctors diagnosed P.E. with infant botulism. Public health investigators later confirmed that she was part of a multistate outbreak caused by ByHeart formula.

2.     The Everetts bring this case to hold Defendant responsible for producing contaminated infant formula that, according to the Centers for Disease Control, has likely sickened at least fifteen infants in twelve states, including their baby.

## PARTIES

3.     Plaintiffs Hanna and Michael Everett are residents of Richmond, Kentucky.

4.     Defendant ByHeart, Inc. ("ByHeart") is a Delaware Corporation with its principal place of business and corporate headquarters located at 131 Varick Street, 11th Floor, New York, New York, 10013.

5.     Defendant ByHeart is therefore a citizen of the State of Delaware and the State of New York.

6.     Upon information and belief, Defendant ByHeart was in the business of manufacturing, marketing, distributing, and selling its infant formula product throughout the United States, including in Kentucky.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and because there is complete diversity of citizenship between Plaintiffs and Defendant. More specifically, Plaintiffs are residents of Kentucky while Defendant ByHeart is a resident of Delaware and New York.

8.     Venue is proper in The United States District Court for the Eastern District of Kentucky pursuant to 28 U.S.C. § 1391(b) and (c) because a substantial part of the events or omissions giving rise to the claim occurred in this District and Plaintiff is domiciled in this District.

**FACTUAL ALLEGATIONS**

**ByHeart Markets a "Better" Formula**

9.      In 2016, Defendant ByHeart was formed because, according to its marketing materials, existing formula manufacturers forced mothers and families to "compromise" the health and safety of infants by using substandard formula.

10.      Defendant ByHeart promised a new and better approach to infant formula.  Among its many marketing promises, the company stated the following:

## A Better Formula for Formula®

We built ByHeart from the ground up to obsessively innovate and improve on behalf of babies and their parents—which means going further in every way.

### Built different, by design.

We hold ourselves to higher standards—because babies (and parents!) deserve it.



# End-to-end is just the beginning.

We're here to innovate everything, even our manufacturing processes. That's why we built from the ground up—to become the first new infant formula manufacturer in the US in 15 years (we're one of only five in the entire country)—owning our entire manufacturing process soup to nuts.



## For us, "clean" isn't just a buzzword. We actually prove it.

To become Clean Label Project Certified, you have to test for 400 contaminants...we test for 700. In 2021, we were the first infant formula to receive this certification (and to win their highest-tier Purity Award!).

11.     Within ByHeart's marketing materials, its co-founders explicitly declare that the company owns and controls its manufacturing facilities, and has "control over every can" of its formula.

12.     In short, Defendant ByHeart aggressively markets its "Whole Nutrition Infant Formula" to families as a healthier and far superior alternative to traditional infant formula.

13.     As it was developing its marketing strategy, ByHeart also aggressively sought venture capital and private equity funding.  For example, the company reported raising $72.2 million in 2025 and $95 million in 2024 alone.

14.     Defendant created a recognizable premium brand with slick, modern marketing, and numerous plausible claims of superiority over other infant formula suppliers.

15.     The reality, however, was that in only a few years of large-scale production, Defendant produced a pathogen-laden product necessitating a recall and utterly failed to take responsibility for the production problems, and did so *before* the present recall and P.E.'s infection.

16.     In 2022, ByHeart immediately backtracked from its marketing claims ("control over every can"), when there proved to be serious safety issues with its formula production.

17.     After testing revealed the possibility of contamination with the deadly bacteria *Cronobacter sakazakii*, Defendant issued a recall but in the recall announcement, explicitly stated that it did not in fact control all of its manufacturing.  Rather, it owned all of its "manufacturing supply chain" except the final canning operation.

18.     The company's public announcement of its 2022 recall stated "this recall is not related to ByHeart's own manufacturing in Reading, PA in any way."

19.     Despite its efforts to distance itself from the potential contamination issue, FDA investigators issued Defendant a Warning Letter reflecting anything but a responsive and responsible company.

20.     In that letter, FDA stated that a "batch of ByHeart Whole Nutrition Infant formula finished product" had tested positive for the deadly *C. sakazakii* bacteria.

21.     Significantly, FDA pointed out that the contaminated finished product was part of a continuous manufacturing process starting with "infant formula base" manufactured at Defendant's Reading, PA facility.

22.     Defendant's root cause analysis into the cause of contamination pointed the finger at a third-party lab rather than any sort of manufacturing issue.

23.     According to the FDA Warning Letter, this conclusion was simply not supportable by the evidence and Defendant failed to take "any additional efforts to evaluate other routes of contamination."

24.     Put differently, in 2022, Defendant had actual notice of manufacturing issues resulting in pathogenic contamination but chose to blame others and protect its precious brand rather than fully evaluate its production processes in light of the contamination.

### Infant Botulism and the Outbreak

25.    Infant botulism is the infectious form of botulism which occurs when swallowed spores of the bacterium *Clostridium botulinum* colonize the baby's large intestine and produce botulinum toxin. The botulinum toxin causes weakness and loss of muscle tone which can lead to difficulty feeding, respiratory distress, and other dangerous complications.

26.    In late October and early November 2025, the CDC detected an increase in the expected number of infant botulism cases and began investigating possible causes.

27.    Although Defendant's formula represents a small percentage of the formula market, public health investigators soon found that multiple infants from different states with infant botulism had all consumed Defendant's formula in the days and weeks before their diagnosis.

28.    FDA shared these striking epidemiological findings with Defendant, prompting a limited recall of two batches of its formula.

29.    As in the 2022 recall, Defendant's first announcement took care to protect its brand and minimize its responsibility.

30.    For example, its announcement states that "FDA has not identified a direct link between any infant formula and these cases and there is no historical precedent of infant formula causing infant botulism."

31.    The company's recall announcement also asserts "Botulism is extremely uncommon in dairy products or infant formula, and is naturally occurring in environmental sources like soil, select vegetables, and dust."

32.    The recall announcement includes the following statement from its "Co-Founder and President": "This voluntary recall is out of an abundance of caution and comes from our ongoing commitment to transparency and safety for babies and their parents. While no testing by ByHeart or

regulatory agencies has confirmed the presence of Clostridium botulinum spores or toxin in any ByHeart product, we are taking this proactive step to remove any potential risk from the market and ensure the highest level of safety for infants."

33.     As part of the public health investigation, the California Department of Public Health tested leftover ByHeart formula that had been fed to a sick infant.

34.     This testing revealed the presence of the bacteria that produce botulinum toxin.  On November 8, 2025, the California Department of Public Health posted its findings to its website.

35.     On November 11, 2025, the product testing result was also included on the CDC website with a link to the California Department of Public Health's announcement of the test results.

36.     Also on November 11, 2025, Defendant expanded its recall to include all ByHeart formula products.

37.     Despite the product testing in California, in its announcement of the expanded recall, Defendant states "It's important that you know that neither we, nor the FDA or CDC, have found *Clostidium botulinum* spores or toxins in any unopened can of ByHeart formula." Indeed, Defendant highlights only that the FDA's investigation is "ongoing" and "we feel that there are still too many unanswered questions."

38.     The company's announcement does not mention the leftover product testing, and its announcement serves only to undermine the actual evidence, and, of course, protect its carefully cultivated brand image.

### P.E.'s Illness and Treatment

39.     Before her illness, P.E. was a happy, healthy four-month old.

40.     After her birth, Plaintiffs chose to use ByHeart Infant formula because based on its advertising, they believed ByHeart made the highest quality, and most nutritious formula available.

41.     Plaintiffs purchased multiple cans of Defendant's formula, mainly via Amazon.

42.     In early November 2025, after consuming Defendant's formula which was contaminated with *Clostridium botulinum*, P.E. became lethargic and developed constipation.

43.     Within days, P.E. exhibited disturbing neurological symptoms, including an inability to take a bottle, and Plaintiffs brought her to the emergency department.

44.     P.E. was admitted to the hospital on November 9, 2025, and her treating physicians soon made a clinical diagnosis of infant botulism and ordered the anti-toxin treatment, which is difficult to produce and extremely scarce. The antitoxin was flown to Kentucky and successfully administered to P.E.

45.     The Kentucky Department of Public Health launched an investigation and soon discovered that Plaintiffs had received one of the initially-recalled batches of Defendant's formula.

## CAUSES OF ACTION

## COUNT I - STRICT PRODUCTS LIABILITY

46.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though each were set forth here.

47.     This Count is brought pursuant to the Kentucky Product Liability Act (KPLA), Ky. Rev. Stat. § 411.300, *et seq.*

48.     At the time of Plaintiffs' injuries, Defendant's infant formula was defective and unreasonably dangerous for use by foreseeable consumers, including Plaintiffs.

49.     Defendant's infant formula was expected to and did reach consumers, including Plaintiffs, in the same or substantially similar condition as when the infant formula left Defendant's possession.

50.     Plaintiffs did not misuse or materially alter the infant formula.

8

51. The infant formula was defective and unreasonably dangerous because it contained *Clostridium botulinum*, a bacteria that causes botulism, a rare, serious illness.

52. The infant formula was therefore not safe as an ordinary consumer would expect it to be when used in a reasonably foreseeable way.

53. Moreover, a reasonable person would conclude that the possibility of seriousness of harm outweighs the burdens and costs of making the infant formula safe. Specifically:

    a. The infant formula designed, manufactured, sold, and supplied by Defendant was defectively designed and placed into the stream of commerce in a defective and unreasonably dangerous condition for consumers;

    b. The seriousness of the potential injuries resulting from the infant formula's contamination by the dangerous bacteria *Clostridium botulinum* drastically outweighs any benefit that could be derived from its normal, intended use;

    c. Defendant failed to properly design, manufacture, market, sell, and supply the infant formula, despite having extensive knowledge that the above injuries could and did occur;

    d. Defendant failed to warn and place adequate warnings and instructions on its infant formula;

    e. Defendant failed to adequately test its infant formula; and

    f. Defendant failed to market an economically feasible, alternative design, despite the existence of economical, safer alternatives that could have prevented Plaintiffs' injuries and damages.

54. A reasonable and prudent seller of infant formula, being fully aware of the risks, would not have placed the infant formula into the stream of commerce.

55.    Defendant's actions and omissions were the proximate cause of Plaintiffs' injuries and damages.

56.    Defendant's conduct, as described above, was extreme and dangerous. Defendant risked the safety and well-being of the consumers of its infant formula, including the Plaintiffs to this action, with the knowledge of its infant formula's safety problems.

## COUNT II: NEGLIGENCE

57.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though each were set forth here.

58.    This Count is brought pursuant to the Kentucky Product Liability Act (KPLA), Ky. Rev. Stat. § 411.300, *et seq.*

59.    Defendant had a duty of reasonable care to design, manufacture, market, and sell non-defective infant formula that was reasonably safe for its intended use by consumers, including Plaintiffs.

60.    Defendant failed to exercise ordinary care in the design, manufacture, marketing, and sale of its infant formula because Defendant knew, or should have known, that its infant formula created a high risk of unreasonable harm to Plaintiffs and other consumers.

61.    Defendant was negligent in the design, sale, manufacture, warning, marketing, and sale of its infant formula because, among other things, it:

   a.    Failed to use due care in designing and manufacturing the infant formula to avoid contamination by *Clostridium botulinum*;

   b.    Placed an unsafe product that was contaminated with *Clostridium botulinum* into the stream of commerce;

   c.    Promoted its infant formula as exceptionally safe in its ubiquitous marketing campaigns across various platforms, including social media;

d.   Were otherwise careless or negligent; and

e.   Other acts and omissions as revealed through discovery.

62.   Although Defendant knew or should have known its infant formula was contaminated with *Clostridium botulinum*, Defendant continued to market its infant formula to the general public.

63.   Defendant's actions and omissions were the proximate cause of Plaintiffs' injuries and damages.

64.   Defendant's conduct, as described above, was extreme and dangerous. Defendant risked the safety and well-being of the consumers of its infant formula, including the Plaintiffs to this action, with the knowledge of its infant formula's safety problems.

## COUNT III: BREACH OF EXPRESS WARRANTY

65.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though each were set forth here.

66.   This Count is brought pursuant to the Kentucky Product Liability Act (KPLA), Ky. Rev. Stat. § 411.300, *et seq.*

67.   Defendant aggressively marketed its product as superior to other infant formulas, promising that its manufacturing approach was safer, cleaner, and more innovative than that of competitors.

68.   That promise was the "basis for the bargain" when Plaintiffs, as new parents of P.E., purchased Defendant's product over other infant formula brands. Specifically, Defendants promised:

a.   That it used a "Better Formula for Formula" when manufacturing its products;

b.   That it "held [itself] to higher standards—because babies (and parents!) deserve it"; and

c.   That, for Defendant, "'clean' isn't just a buzzword" because it is "Clean Label Project Certified."

11

69.     Consumers like Plaintiffs were the intended third-party beneficiaries of these express warranties.

70.     Defendant's infant formula, however, did not conform to any of these express warranties because it contained *Clostridium botulinum*, a dangerous bacteria.

71.     Defendant breached its express warranties in the following ways, among others:

    a.     Defendant's infant formula was not safer or cleaner than its competitor's products because it contained *Clostridium botulinum*, a dangerous bacteria; and

    b.     Defendant's manufacturing process was not more innovative than its competitors because it failed to prevent *Clostridium botulinum* from contaminating its products; and

72.     Plaintiffs used the infant formula with the reasonable expectation that it was properly designed and manufactured, safe and free of deadly pathogens, and that it was therefore safe for consumption by infants.

73.     Defendant's breach of its express warranties was the direct and proximate cause of Plaintiffs' injuries.

74.     Defendant's conduct, as described above, was extreme and dangerous. Defendant risked the safety and well-being of the consumers of its infant formula, including the Plaintiffs to this action, with the knowledge of its infant formula's safety problems.

**COUNT IV: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

75.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though each were set forth here.

76.     This Count is brought pursuant to the Kentucky Product Liability Act (KPLA), Ky. Rev. Stat. § 411.300, *et seq.*

77.     When Defendant designed, manufactured, marketed, and sold its infant formula to Plaintiffs, Defendant warranted that its infant formula was merchantable and fit for the ordinary purposes for which it was intended, namely, consumption by infants.

78.     Consumers like Plaintiffs were the intended third-party beneficiaries of the implied warrant of merchantability.

79.     Plaintiffs reasonably relied on Defendant's representations that its infant formula was safe.

80.     Defendant's infant formula, however, was not merchantable because it contained *Clostridium botulinum* and had the potential to lead to serious personal injuries as alleged in this Complaint.

81.     Plaintiffs used the infant formula with the reasonable expectation that it was properly designed and manufactured, free from defects of any kind, and that it was safe for its intended, foreseeable use of consumption by infants.

82.     Defendant's breach of implied warranty of merchantability was the direct and proximate cause of Plaintiffs' injuries and damages.

83.     Defendant's conduct, as described above, was extreme and dangerous. Defendant risked the safety and well-being of the consumers of its infant formula, including the Plaintiffs to this action, with the knowledge of its infant formula's safety problems.

## CLAIM FOR PUNITIVE DAMAGES

84.     Plaintiffs incorporate the preceding paragraphs by reference as if each paragraph were set forth here.

85.     At all relevant times, Defendant designed, manufactured, marketed, and sold the infant formula that was purchased by Plaintiffs and consumed by P.E. and that resulted in P.E.'s physical injuries and suffering.

13

86.     When Defendant performed the above-described affirmative, voluntary, and intentional acts, Defendant had good reason to know or expect that its infant formula contained *Clostridium botulinum*, a dangerous bacteria capable of causing harm to an infant's health.

87.     Defendant's negligent, reckless, willful, fraudulent and/or wanton actions and/or intentional failures to act caused Plaintiffs' infant, P.E., to be exposed to *Clostridium botulinum*.

88.     The willful, wanton, malicious, fraudulent and/or reckless conduct of Defendants, includes, but is not limited to:

a.    Issuing no warnings and failing to reveal material information about the possible contamination of its infant formula by dangerous pathogens despite a history of contamination of its products and/or at its manufacturing facility; and

b.    Concealing, withholding, and/or misrepresenting information regarding the contamination of its infant formula by dangerous pathogens, including *C. sakazakii* and *Clostridium botulinum*.

89.     Because of Defendant's conduct, Plaintiffs incurred significant costs related to the harm caused by Defendant's products and suffered serious injuries as a direct and proximate result.

90.     Defendant has demonstrated an outrageous conscious disregard for the physical safety of Plaintiffs and acted with a wanton or reckless disregard for the lives or safety of others, warranting the imposition of punitive damages.

## **DAMAGES**

91.     Plaintiffs incorporate the preceding paragraphs by reference as if each paragraph was set forth here.

92.     Plaintiffs suffered general, special, incidental, and consequential damages as a direct and proximate result of the acts and omissions of Defendant, in an amount that shall be fully proven at the time of trial. Such damages include, but are not limited to: past and future damages for pain and

suffering, loss of enjoyment of life, mental distress, and fear of future illness and death; past and future medical expenses and other costs or related out-of-pocket expense; lost wages, past and future; and any other damages that are reasonably anticipated to arise under the circumstances.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Hanna and Michael Everett pray for judgment against Defendant as follows:

    **a.** For an award of compensatory damages, including damages against Defendant for medical and hospital expenses, pain and suffering, disability and other damages according to proof at trial in excess of Seventy-Five Thousand Dollars ($75,000.00);

    **b.** For an award of punitive or exemplary damages against Defendant in excess of Seventy- Five Thousand Dollars ($75,000.00);

    **c.** For reasonable attorneys' fees and costs;

    **d.** For prejudgment interest;

    **e.** That the Court award Plaintiffs the opportunity to amend or modify the provisions of this *Complaint* as necessary or appropriate after additional or further discovery is completed in this matter, and after all appropriate parties have been served; and

    **f.** For such further and other relief this Court deems just and equitable.

### DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all claims asserted in this Complaint so triable.

**RITTGERS RITTGERS NAKAJIMA**

Wesley M. Nakajima (93210)
Justin A. Sanders (90390)
401 Scott Street
Covington, KY 41011
Phone: 859-972-0560
Fax: 513-934-2201
matt@rittgers.com
justin@rittgers.com

**and**

(*PRO HAC VICE* Pending):

Brendan J. Flaherty (0327657)
OFT Law PLLC
800 LaSalle Ave. Suite 2260
Minneapolis, MN 55402
Phone: 888-828-7087
Fax: 888-239-0559
brendan@oftlaw.com